## CIRCUIT COURT OF FAIRFAX COUNTY

Robert L. White

v.

J. Robert Cassady

July 8, 1992

Case No. (Law) 107668

BY JUDGE THOMAS S. KENNY

In this defamation action, plaintiff has moved for an order compelling the defendant and certain witnesses to respond to his discovery requests. At issue is the scope and applicability of § 8.01–581.17, Va. Code Ann. (Repl. Vol. 1984). That section establishes a privilege against disclosure or discovery of various aspects of the work of what are commonly referred to as "peer review" committees for health care providers.

The plaintiff is a radiation oncologist who formerly practiced at the Winchester Medical Center ("the Center").[1] He joined the Center staff as an associate member in 1989 and submitted to the standard one-year review period required of all applicants for staff privileges, while being monitored by two preceptors already on the staff. At the conclusion of the review period, the preceptors disagreed on whether Dr. White should be made a full member of the attending staff. As a result, the Credentials Committee, which is charged with investigating such appointments and making recommendations to the Staff Executive Committee ("the SEC"), recom-

---

[1] Many of the facts set forth in this opinion are drawn from the plaintiff's statement of facts in his memorandum supporting his motion to compel. For purposes of this motion, I will accept such statement as correct, but this, of course, is without prejudice to the defendant's right to contest these a trial. In stating the background of this case for this opinion, I am not making any findings of fact that will be binding in this case.

mended to the SEC that Dr. White's probationary period be extended for six months. Under the Bylaws of the Center, this was one of the recommendations that the Credentials Committee could make to the SEC. *Bylaws*, III-4.a, p. 11.

Article II, § 3.g, of the Bylaws provides that when the Credentials Committee recommendation is adverse to the applicant, the SEC "shall either accept or reject the recommendation of the Credentials Committee." *Bylaws*, p. 5. In this case, the SEC went beyond the Credentials Committee recommendation by imposing a longer probationary period on Dr. White, appointing new preceptors for him, and requiring him to have a nurse present during all patient examinations.[2] Furthermore, the SEC, apparently feeling that its in-house expertise was inadequate, suggested that the hospital should "call in an outside reviewer and have them look at the blocks [i.e., the areas of each patient's body to be exposed to radiation] used for the radiation fields for individual patient treatment." *Minutes, SEC,* 6/12/90.[3]

The board of directors of the Center approved the request for an outside consultant, and the defendant, the head of the radiation oncology department of the University of Arizona Health Sciences Center, was ultimately selected as the outside consultant. A letter confirming his appointment was sent to Dr. Cassady by Mr. George Caley, senior vice-president for operations of the Center, on August 2, 1990. That letter is not clear about the scope of Dr. Cassady's review (i.e., whether it was to be limited to Dr. White's blocks, or was of the entire section). *Caley letter,* 8/2/90.

Dr. Cassady's written report to Mr. Caley, however, seems clearly to be a review of the entire section. Both Dr. Smith and Dr. White came in for criticism by Dr. Cassady, but the most negative remarks were focused on Dr. White. *Cassady Report Letter,* 8/30/90. The report letter was written to confirm an oral report by Dr. Cassady to

---

[2] This was apparently intended to monitor whether particular procedures were being used, and not because of any allegations of personal impropriety between Dr. White and his patients.

[3] The following day, Dr. Joseph Deignan, the president of the Medical Staff, wrote to Dr. White that the SEC had decided to "select someone to thoroughly review *the work of the Radiation Therapy section of the Cancer Center.*" Deignan letter, 6/13/90; (emphasis added). It is not clear why the scope of the review was expanded from a review of Dr. White's "blocks" to a review of the entire section, which apparently consisted of Dr. White and Dr. Norman Smith.

Mr. Caley after Dr. Cassady had finished his on-site review on August 28, 1990. These oral and written communications from the defendant to Mr. Caley form part of the basis of this defamation action.

After he sent his written report to Mr. Caley, Dr. Cassady discussed his findings in a telephone conversation with Dr. William Houck, a Winchester oncologist who had been one of Dr. White's preceptors during his probationary period. (It was apparently Dr. Houck who opposed Dr. White's permanent appointment to staff when it was being considered by the Credentials Committee.) This communication with Dr. Houck formed the basis for the remainder of the plaintiff's defamation claim.

At issue is whether § 8.01–581.17 protects from discovery the substance of the various communications involved in this case. More specifically, the issues with respect to this statute are:

1. Are the defendant's oral and written reports to Mr. Caley protected from discovery?

2. Are the statements made to the defendant by third party interviewees on the hospital staff, which the defendant used in the preparation of his report, protected from discovery?

3. Are the defendant's conversations with Doctor Houck protected from discovery?

4. Who has standing to assert or waive the privilege?

Section 8.01–581.17 provides a limited privilege against disclosure or discovery of certain records and reports of peer review committees and persons communicating with them.[4] Because the statute defines the protected committees by reference to § 8.01–581.16,[5] it is necessary to start our analysis there. A review of the

---

[4] The statute provides, in pertinent part, as follows: "The proceedings, minutes, records, and reports of any medical staff committee, utilization review committee, or other committee as specified in § 8.01–581.16, together with all communications, both oral and written, originating in or provided to such committees are privileged communications which may not be disclosed or obtained by legal discovery proceedings unless a circuit court, after a hearing and for good cause arising from extraordinary circumstances being shown, orders the disclosure of such proceedings, minutes, records, reports, or communications." Code of Virginia, § 8.01–581.17 (Repl. vol. 1984).

[5] That statute reads, in pertinent part, as follows: "Every member of, or health care professional consultant to, any committee, board, group, commission or other entity shall be immune from civil liability for any act, decision, omission, or utterance done or made in performance of his duties while serving as a mem-

Center's Bylaws indicates that the SEC has the responsibility for receiving *and acting upon* the reports of the various standing committees of the professional staff, such as the Credentials Committee, the Medical Audit/Utilization Committee, the Institutional Review committee and similar committees involved in peer review. *Bylaws*, p. 31. The SEC therefore deals directly, under the Bylaws, with exactly the kinds of issues described in § 8.01–581.16, and as such its proceedings are privileged under § 8.01–581.17.

So, too, are any communications between the SEC and a health care professional consultant to the committee. The defendant here is unquestionably a "health care professional consultant," but the plaintiff asserts that the defendant was a consultant to *the Center*, through Mr. Caley, and not to the SEC. Since the statute does not refer to consultants to hospitals, but only to committees established by hospitals, the privilege should not, according to the plaintiff, apply here.

I disagree. Dr. Cassady's study was done at the request of the SEC and to its specifications. The Center merely acted as a funding conduit to execute the study requested by the SEC. The report by Dr. Cassady, while nominally addressed to Mr. Caley, was clearly directed to the SEC in response to its request for such a peer review study by an outside consultant. There is no indication that the Center made any effort to guide, edit, or otherwise control the process. Thus, I conclude that the communication of Dr. Cassady's report to Mr. Caley, both orally and in writing, was a privileged communication under § 8.01–581.17.

Because Dr. Cassady's report was privileged, the underlying statements by persons he interviewed in preparing his report is similarly privileged. In essence, Dr. Cassady was acting as an agent of the SEC in preparing his report, and these statements were "communications . . . provided to [the SEC]" in connection with his report.

---

ber of or consultant to such committee, board, group, commission, or other entity, with functions primarily to review, evaluate, or make recommendations on . . . . (ii) the professional services furnished with respect to the medical . . . necessity for such services, (iii) the purpose of promoting the most efficient use of available health care facilities and services, (iv) the adequacy or quality of professional services, [or] (v) the competency and qualifications for professional staff privileges . . . provided that such entity has been . . . established and duly constituted by one or more public or licensed private hospitals . . . and provided further that such act, decision, omission or utterance is not done or made in bad faith or with malicious intent."

The privilege afforded by the statute is a limited one and is subject to the condition that it can be overcome by a showing of good cause arising from extraordinary circumstances. No such showing has been made here. I therefore conclude that the communications made to Dr. Cassady in the course of his research for his report, as well as the report itself, both oral and written, to Mr. Caley, are protected from disclosure and discovery in this case.[6]

However, the same cannot be said about the communications between Drs. Cassady and Houck *after* the report was complete. That conversation was not a report to the SEC; Dr. Houck was not a member of the SEC. Nor was it an interview in connection with the preparation of a privileged report; the report was already complete and delivered. It is possible that the conversation may qualify for a common-law qualified privilege of some sort, but that is not before the court and, in any event, would not protect it from discovery, which is the issue here. I therefore rule that the post-report conversations with Dr. Houck are discoverable.

Dr. White claims that as the subject of the communications, he should be allowed to waive the privilege against disclosure and discovery. He asserts, without supporting authority, that the purpose of the privilege is to prevent professional embarrassment to health care providers who are subjected to peer review. Without ruling on whether Dr. White would be permitted to *prevent* disclosure of this material to a third party, I am prepared to say that I do not agree that that is the sole purpose of the statute. It is at least equally apparent that the General Assembly, in adopting this statutory scheme, intended to promote vigorous debate and institutional analysis without fear by participants of reprisals against them by a disgruntled subject. One such participant is Dr. Cassady. He is entitled to assert the privilege, and he has done so.

Finally, the plaintiff claims that the Center and Dr. Cassady have waived any privilege with respect to this material by already providing Dr. White with copies of most of it. (The current discovery dis-

---

[6] This does not necessarily mean that Dr. Cassady enjoys the immunity from civil liability afforded by § 8.01–581.16. The privilege statute and the immunity statute are not co-extensive. *See, Klarfeld v. Salsbury*, 233 Va. 277, 284 (1987). While the *privilege* can be overcome by a showing of "good cause arising from extraordinary circumstances," the *immunity* can be overcome by a showing that the acts complained of were "made in bad faith or with malicious intent." I do not believe that the two showings are synonymous.

pute arises in the context of the Center's refusal to authenticate any of the previously-provided documents and Dr. Cassady's "selective" assertion of the privilege during his deposition.) Dr. White was provided those copies outside of the litigation context for his use. He can make what use he wants of it, but I am not prepared to rule that the Center's actions have waived the privilege now asserted by Dr. Cassady. He is the defendant in this action, he is the one entitled to assert the privilege, and the Center is bound to honor that assertion in the absence of a court order to the contrary.[7]

For the reasons stated above, therefore, the motion to compel discovery is granted as to the communications with Dr. Houck after the report was completed and denied as to all else.

---

[7] Because of the Center's actions in previously providing copies of these documents to the plaintiff, however, I believe that it should be estopped from challenging the authenticity of any of the documents so provided.